J-S34004-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN THE INTEREST OF: G.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: M.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 362 WDA 2024 |

Appeal from the Order Entered February 16, 2024
In the Court of Common Pleas of Clarion County Orphans' Court at
No(s):  No. 30 DP 2022

BEFORE:   DUBOW, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY DUBOW, J.:                    **FILED: November 13, 2024**

M.B. ("Mother") appeals from the February 16, 2024 order changing the permanency goal for her child, G.M., born in January 2017, from Reunification to Adoption.  Mother's counsel, Gina L. Bianco, Esq., has filed an **Anders**[1] brief and a Motion to Withdraw as Counsel.  Following careful review, we affirm the Order and grant counsel's motion to withdraw.

**A.**

We glean the relevant factual and procedural history from the trial court's opinion and the certified record.  In September 2022, after receiving reports of Mother's homelessness, her leaving G.M. for extended periods of time with caregivers and disappearing, and her substance abuse, the Clarion

---

[*] Former Justice specially assigned to the Superior Court.

[1] **Anders v. California**, 386 U.S. 738 (1967).

County Children and Youth Services ("CYS") took emergency custody of G.M. and placed him in kinship foster care.[2] On October 17, 2022, following a hearing, the court adjudicated G.M. dependent, directed that he remain in foster care, and entered a placement goal of Reunification. The court directed Mother to cooperate with CYS and its permanency plan, participate in mental health and drug and alcohol evaluations and the recommended treatments, and visit regularly with G.M.

On November 14, 2022, following a hearing, the court found Mother had moderately complied with the permanency plan by recently scheduling a drug and alcohol appointment with CenClear and beginning a parenting education program through Justice Works Nurturing Parenting Substance Abuse. The court also found that Mother was living in SAFE housing, a domestic violence shelter, and regularly attended visits with G.M.. The court maintained the current placement goal of Reunification and added a concurrent placement goal of Adoption.

From November to December 2022, and from February 28, 2023, to March 14, 2023, Mother was incarcerated for probation violations and drug charges.

At the April 10, 2023 permanency review hearing, the court found that Mother had been minimally compliant with the permanency plan. The court

___

[2] Father is incarcerated in Ohio, and his expected release date is in 2029. CYS placed G.M. initially with G.M.'s aunt but ultimately changed his placement to his current home with his paternal grandmother, T.O., who is his adoptive resource.

noted that Mother had tested positive for illegal substances on more than one occasion, had been incarcerated during the review period, had not obtained the recommended psychiatric evaluation or stable housing, did not attend G.M.'s medical appointments, and was not consistent in her drug and alcohol counseling. The court maintained the placement goal of Reunification with a concurrent goal of Adoption.

In July 2023, Mother tested positive for methamphetamines. She was incarcerated from July 21, 2023, to August 8, 2023, and then transferred from Clarion County Jail to Glenbeugh dual rehabilitation facility until her release on September 5, 2023.

On September 22, 2023, following a permanency review hearing, the court found Mother had moderately complied with the permanency plan. The court noted that prior to her incarceration, Mother had been participating in mental health counseling regularly and found that she had resumed services following her release from the rehabilitation facility. The court also found that Mother had reengaged with Justice Works Nurturing Parenting Substance Abuse program following her release. The court further found that Mother did not have stable housing and was living at a temporary residence for homeless people that did not allow children. The court maintained the placement goal of Reunification concurrent with Adoption.

On December 11, 2023, the Commonwealth arrested Mother based on allegations of theft from the shelter where she was living. She entered a guilty

plea to those charges and expected to be released on parole at the end of February 2024.

At a hearing on February 1, 2024, Erin Schrecengost, the family's CYS caseworker, testified as to Mother's moderate compliance with her substance abuse and mental health treatment goals and her three periods of incarceration that have occurred since the beginning of CYS's involvement. She also noted that Mother had unsuccessfully applied for social security disability payments due to her anxiety. Ms. Schrecengost testified that Mother's visits with G.M. had gone well in the past and stated that Mother's last visit with G.M. was November 26, 2023, and that Mother had cancelled the visit scheduled for December 3, 2023, due to illness. She further stated that Mother has not had any visits with G.M. since her arrest on December 11, 2023. She recommended that the goal be changed to Adoption "because over the past seventeen months [Mother] has not made substantial progress to remedy the issues that led [G.M.] to come into care, . . . so permanency needs to be established for [G.M.]" N.T. Hr'g, 2/1/24, at 17. She acknowledged that G.M. and Mother have a bond and stated that G.M.'s paternal grandmother is open to Mother having contact with G.M. if she is well enough to do so.

Mother testified that following her release from jail at the end of February 2024, she planned to move in with her boyfriend and that her boyfriend had spoken with the owner of Johnny on the Spot for her to work part-time doing odd jobs. She testified about her numerous mental health

diagnoses, including PTSD, generalized anxiety disorder, and ADHD, and her application for social security disability payments. She testified that prior to her incarceration, she had been attending general therapy at CenClear and received EMDR therapy for trauma. She also testified that, while incarcerated, she attends Alcoholics Anonymous ("AA") meetings and stated that upon her release, she intended to resume more intensive mental health counseling, as well as participate in Narcotics Anonymous ("NA") and AA programs. She also testified that, although the probation department had expressed its disagreement with her moving in with her boyfriend, which she attributed to NA protocols, her boyfriend is "clean," has known G.M. since birth, and has a good relationship with G.M.

Following argument from counsel, the court observed that Father is not in a position to be considered a resource for G.M. for many years. Addressing Mother, the court stated:

> [Y]ou've testified about the progress that you were making before your most recent incarceration, and I am obviously aware as having presided over your case in Behavioral Health Court, as well as everything that's gone on in this case as well, that you did have a period of sobriety and a period of improvement with your mental health, however, throughout this entire case and your entire time in behavior health court, you have really not at any point in time rose to a level where you were in a position that you could care for [G.M.] on your own. You've had issues with housing. You've had issues, obviously, with employment and income. And where you stand at this point you know, obviously you're almost a month out from being released from [incarceration] before you could secure housing, before you could secure any type of, you know, reasonable income that would provide stability for [G.M.] So, looking at his long-term prospects, obviously he is in a home right now where he's doing really well. I did meet him and talk to him

briefly before we came into the courtroom, and he seemed to be happy, and he's healthy, and he has a good relationship with his grandma and her paramour. I think that's really great for [G.M.] to be in that position because [even] before this case began, he was really in a precarious situation where he didn't have a home, and I know that you're saying that [G.M.] says he wants to come back home, but he doesn't really have a home to come back to at this point in time. So, you do have, you know, a lot of work to do which I think you've acknowledged to get back on track and to get to a level of stability where you could, you know, be a regular participant in [G.M.'s] life[.] But for [G.M.'s] sake, the decision has to be made in what is in his best interest. I don't doubt that, you know, that he cares about you and that the two of you have a good relationship, and it sounds like [T.O.] is open to continuing that relationship with you as things move along, as long as you're stable and healthy, but you're not in a position and you haven't really demonstrated that you're anywhere close to being in a position to care for him on a full time basis and provide for his needs. So, I do think it is in [G.M.'s] best interest for the goal to be changed today to be able to get him some level of permanency where he knows that he's going to be in a long-term home and not disrupted at any point in time. So, I am going to change the goal today from reunification to adoption.

N.T. Hr'g at 42-44; **see also** Findings of Fact, 2/7/24[3] (noting that, although Mother had made progress with sobriety from September to December 2023, "Mother made no progress toward employment, was denied social security, and made no progress toward obtaining housing that would be suitable for [G.M.].").

On February 16, 2024, the court entered an order changing the dependency goal from Reunification to Adoption.

---

[3] The court provided its Findings of Fact on one, single-spaced document; therefore, there is no need for pinpoint citations.

Mother filed a timely notice of appeal and a Pa.R.A.P. 1925(b) Statement. The court filed its Rule 1925(a) Opinion. Counsel filed an **Anders** brief and a petition to withdraw from representation.

**B.**

As a preliminary matter, we address counsel's Petition to Withdraw. "When presented with an **Anders** brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw." **Commonwealth v. Daniels**, 999 A.2d 590, 593 (Pa. Super. 2010) (citation omitted). In order for counsel to withdraw from an appeal pursuant to **Anders**, our Supreme Court has determined that counsel must meet the following requirements:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Commonwealth v. Santiago**, 978 A.2d 349, 361 (Pa. 2009).

Counsel has complied with the mandated procedure for withdrawing as counsel. Additionally, counsel confirms that she sent Appellant a copy of the **Anders** Brief and Petition to Withdraw, as well as a letter explaining to

Appellant that she has the right to retain new counsel, proceed *pro se*, or to raise any additional points. **See Commonwealth v. Millisock**, 873 A.2d 748, 751 (Pa. Super. 2005) (describing notice requirements).

Because counsel has satisfied the above requirements, we now have the responsibility to "make a full examination of the proceedings and make an independent judgment to decide whether the appeal is in fact wholly frivolous." **Santiago**, 978 A.2d at 355 n.5 (citation omitted); **see also Commonwealth v. Yorgey**, 188 A.3d 1190, 1197 (Pa. Super. 2018) (*en banc*) (noting that **Anders** requires the reviewing court to "review 'the case' as presented in the entire record with consideration first of issues raised by counsel").

**C.**

We first address the issue raised by counsel in the **Anders** Brief: whether the court erred in changing G.M.'s dependency goal from Reunification to Adoption when Mother and G.M. share a positive bond. **Anders** Br. at 8.

We review a trial court's decision to change a child's permanency goal to Adoption for an abuse of discretion. **In re R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010). To conclude that the court abused its discretion, this Court "must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record." **Interest of H.J.**, 206 A.3d

22, 25 (Pa. Super. 2019) (citation omitted). Our standard of review in dependency cases requires this Court "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." **R.J.T.**, 9 A.3d at 1190. This Court is "not in a position to make the close calls based on fact-specific determinations." **Id.** Rather, "we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan." **Id.** Notably, even if this Court "would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court." **Id.**

The overarching purpose of the Juvenile Act, which governs goal change requests, is "[t]o preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S. § 6301(b)(1). At each permanency review hearing, the trial court must consider, *inter alia*, "the continuing necessity for and appropriateness of the child's placement[,]" the "extent of compliance with the permanency plan[,]" "[t]he extent of progress made toward alleviating the circumstances which necessitated the original placement[,]" "[t]he appropriateness and feasibility of the current placement goal for the child[,]" the likely date the goal might be achieved, and the child's safety. 42

Pa.C.S. § 6351(f). The focus of goal change proceedings, like all dependency proceedings, "is on the safety, permanency, and well-being of the child[,] and the best interests of the child must take precedence over all other considerations." *H.J.*, 206 A.3d at 25. "The parent's rights are secondary in a goal change proceeding." *In re R.M.G.*, 997 A.2d 339, 347 (Pa. Super. 2010) (citation and internal quotation marks omitted). Thus, "[b]ecause the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan." *R.M.G.*, 997 A.2d at 347.

"When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home." *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006). This Court has held that placement in a pre-adoptive home should be completed within 18 months. *H.J.*, 206 A.3d at 25. "A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003) (citation omitted). "Thus, even where the parent makes earnest efforts, the court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *R.M.G.*, 997 A.2d at 347 (citation and internal quotation marks omitted).

In the instant case, the trial court considered the Section 6351(f) factors before concluding that a goal change to adoption is in G.M.'s best interest. The court found:

Mother briefly demonstrated some progress toward stability during this review period. She began participating in the court's Behavioral Health Court program and was provided with a high level of structure and supervision to assist with her substance use and mental health needs. She initially struggled with testing positive for methamphetamine, was incarcerated briefly and then participated in inpatient rehab. After completing rehab in September 2023, her drug tests were negative for all substances, and she demonstrated growth with her attitude and mental health. Her progress continued up until her incarceration in December 2023. She was incarcerated at that time and expelled from Behavioral Health Court because she was charged with stealing money from the agency that was providing her housing at the time. She has since entered a guilty plea to those charges and is serving a period of incarceration with expectations of being paroled at the end of February 2024. Even considering her progress with sobriety from September to December, Mother made no progress toward employment, was denied social security, and made no progress toward obtaining housing that would be suitable for [G.M.] She has a long road ahead of her before she would be able to provide [G.M.] with a safe, stable home.

[G.M.] was placed with his paternal grandmother approximately four (4) months ago. He is reportedly adjusting quite well to her home; he has a bond with her and a good relationship with her paramour. Grandmother is currently attending to all of [G.M.'s] needs and is willing to provide him with a permanent home. He is loved and stable in her care[,] and she wants to adopt him.

While it is likely that [G.M.] has a connection with his Mother, she has not provided care for him over the past 17 months while has been a dependent child, nor was she caring for him before that. In fact, she had left him with various other people due to her ongoing struggle with substance abuse and inability to provide him with a stable home. Her plan upon release from incarceration later this month still does not involve stable enough income or housing for [G.M.] It is clearly in [G.M.'s]best interest to move toward permanency in the home of his grandmother rather than

- 11 -

continuing to wait for his Mother to possibly make progress to the point that she could care for him, when she has been unable to do so for a significant period of his life already.

Findings of Fact.

Based on our review, we conclude the trial court's findings of fact are supported by the record. The court considered the Section 6351(f) factors at the hearing before reaching its conclusion that it was in G.M.'s best interests to change the placement goal to Adoption. **See** N.T. Hr'g at 42-44. Although the court acknowledged that "[G.M.] has a connection with [Mother] and enjoys visiting with her," it observed that "[Mother] has not provided care for him at any point while he has been a dependent child" and G.M.'s " best interest will be served by changing the goal from reunification to adoption by his paternal grandmother." Tr. Ct. Op., 3/25/24, at 4.[4]

We discern no abuse of discretion in the court's determination and we, thus, conclude that the issue raised in the **Anders** brief merits no relief. Moreover, after conducting our independent review, we discern no issues of merit to be considered on appeal. Accordingly, we affirm the order changing

---

[4] Consideration of a child's bond with his parent is not a Section 6351 factor to be considered in a goal change proceeding. However, if a party files a Petition to Terminate Parental Rights, the trial court must then determine, *inter alia*, whether terminating parental rights is in a child's best interest "with utmost attention to the effect on the child of permanently severing the parent-child bond." **In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011).

G.M.'s placement goal from Reunification to Adoption and grant counsel's motion to withdraw.[5]

Order affirmed. Motion to Withdraw granted.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 11/13/2024

---

[5] We are aware that "allowing counsel to withdraw prior to the entry of an involuntary termination decree presents certain complications unique to dependency and adoption proceedings. . . . [P]arents have a right to counsel at every stage of a dependency proceeding, and dependency proceedings do not end merely because a trial court enters a goal change order." **In re J.D.H.,** 171 A.3d 903, 906 (Pa. Super. 2017). Accordingly, although we permit counsel to withdraw in this case, Mother is still entitled to counsel pursuant to 42 Pa.C.S. § 6337. "If Mother could not afford counsel, the trial court would need to appoint new counsel for her in any subsequent proceedings." **J.D.H.,** 171 A.3d at 906.